THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* KRENLY OLIVENCIA AND FERNANDO OLIVENCIA, Defendants and Appellants.

No. 7480. Argued March 21, 1939.—Decided May 31, 1939.

*A. Ramírez Silva* and *P. Baigés Gómez* for appellants. *R. A. Gómez*, *Prosecuting Attorney*, for The People, Appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

The information filed by the district attorney in this case was for murder in the first degree. In its pertinent part it reads as follows:

"The aforesaid defendants, Krenly Olivencia and Fernando Olivencia, on or about the night of November 30, 1936, at dawn of December 1, 1936, in Mayagüez, P. R., which is part of the Judicial District of the same name, illegally, voluntarily, with malice aforethought, implied and expressed, and with the firm and deliberate intention of killing while in the commission of a robbery, and evidencing a perverted and cruel heart, illegally killed the human being Claudio Vientós Hernández, also known as Claudio Hernández, whom they assaulted and battered with a piece of wood, to wit: a baluster of native wood which is an instrument capable of causing a contusion, seriously injuring him on the head, in consequence of which wound the aforesaid Claudio Vientós Hernández, known as Claudio Hernández, died at dawn December 1, 1936, then and there, and that said wound was caused by the defendants, Krenly Olivencia and Fernando Olivencia, acting together, to the deceased Claudio Vientós Hernández, known as Claudio Hernández, with intent to kill him."

The information was filed on March 9, 1937, and was read to the defendants the 18th of that same month, and a copy thereof was delivered to them and they were given five days to answer. At the expiration of said term they appeared through their attorney who pleaded not guilty on their behalf, and requested trial by jury.

On the following June 14, the trial began and continued through the 14th, 15th, 16th, 17th and ended on the 18th, whereupon the jury brought a verdict convicting both defendants of murder in the second degree, and praying for leniency in the imposition of the sentence.

June 23, 1937, was the day set for imposing sentence on the defendants, but a suspension was granted at the request of the defendants, granting them until the 30th to file a motion for a new trial, the term was subsequently extended again at their request.

The motion was filed on the 15th of the following July. Both parties were heard on August 5, on the 6th the motion was denied, and on September 2 judgment was rendered and each of the defendants was sentenced to twenty years imprisonment at hard labor.

The very 2nd of September, 1937, Krenly and Fernando Olivencia appealed to this court from the order denying them a new trial and from the judgment. The record of the case was filed with the clerk of this court on November 29, 1938. On January 9, 1939, the defendants filed their brief and the prosecuting attorney filed his on the following March 18. The hearing of the appeal took place on the 21st of last March.

Thirteen errors are assigned as having been committed by the court. The first eleven errors concern the introduction of evidence, the twelfth charges that the court erred in weighing the evidence, and the thirteenth that the court commited error in refusing to grant a new trial.

■■ After a careful study of the record, it seems convenient to examime the evidence in order to decide the twelfth error assigned, and to study subsequently the other eleven errors, which will automatically decide the thirteenth, inasmuch as the grounds that served as basis to the motion for a new trial were the very errors herein urged in behalf of the reversal.

The first document introduced by the People through its district attorney was the death certificate of Claudio Hernández, single, thirty years of age, born in San Sebastián, then residing in the corner of Tamarindo and San Ignacio streets of Mayagüez, who died in said city on December 1, 1936, as the result of cerebral hemorrhage.

Immediately afterwards came the testimony of Doctor Pedro Perea Fajardo, a physician and surgeon, who performed the autopsy on the body. First he examined the encephalic mass and the hair covered with blood. Thereafter he examined the wounds. He had two contusive injuries, one in the occipital region, the other in the parietal. He raised the scalp and found that the occipital bone was broken in eight or ten different places and the parietal towards the base of the skull. There was profuse bleeding (a hemorrhage) from the mouth and the nose. The immediate cause of the death was the hemorrhage resulting from the cerebral injury.

Upon being called to testify, Andrés Vélez, an insular policeman, related that the night of November 30 or the dawn of December 1st, he was sleeping at headquarters when he was called by the officer on duty, whereupon "I took out from the garage the 'police patrol car' and went to the Ward Salud of Mayagüez, 'Jagüita' street corner of 'San Ignacio', and there I found Claudio Vientós Hernández, known as Claudio Hernández, lying on his face in a pool of blood, with a wound on his head . . . about five feet distant I found a crannied wooden baluster, full of blood and with a lock of heir sticking to it. I placed the patrol facing him in order

to have some light, and he had his right back pocket turned outward, and the left one also partly turned out. I then called the policeman from the ward 'Salud' and I went to the district attorney. I explained to him what had occurred, and he ordered the removal of the body to the cemetery chapel. Before being removed to the chapel he had one hundred and sixty four dollars and I also found on him a white handkerchief with green stripes that was full of blood; he also had on his person, a pair of eyeglasses, a comb and a fountain pen . . . In his inside coat pocket. I also found a bloody pocket-book . . . . ''

He was shown the objects mentioned in his testimony and he identified them as the ones he found and gave to the district attorney. They were introduced in evidence without objection.

The *corpus delicti* thus established, the People went on to introduce its evidence in relation with the crime.

Matildo Colón Rivera testified that on the night of November 30 and dawn of December 1, 1936, he was returning "from a birthday wake at his brother's house", in the ward Juan Alonso of Mayagüez; it was past one o'clock; he saw two young men standing in the corner of San Ignacio and Jagüita streets. He recognized one of them, Krenly Olivencia, the defendant, who was dressed in white. The other young man was "quite stout and not very tall. He was dark." He was wearing a "dark red or wine color shirt."

The witness kept on walking and upon arriving "at the corner of San Ignacio street where the store of Juan Mari is located, we found Claudio Hernández, saying hello to him. Upon being asked: "What way was Claudio Vientós going?" He answered: "He was walking towards those young men."

Witness Ana Luisa Torres Pratts, who was one of the persons returning from the wake to the city with Colón Rivera, corroborates Rivera's testimony.

Hilergio del Toro was the following witness. He stated that he went alone through Mayagüez in an automobile the very night of the crime. He was going through the ward Salud and "upon arriving at the street where doctor Guzmán lives, I heard a noise similar to the falling of a piece of wood, to the left, and there I looked and saw the glare of a piece of wood, just like when a policeman throws a stick on the ground, then I looked to my left and saw at about thirty or thirty five feet a person running towards one side and another towards the other side, and a person apparently trying to raise himself from the ground, and I continued my trip to Cabo Rojo."

One of the persons running was dressed in white or cream color, he could not notice very clearly, the other one wore no coat. He thinks it was about one fifteen.

Upon being called Carlos Ayala Pagán testified that that night he was in the "Club Mayagüezano". He was there until about one o'clock. At that hour he went towards the house of a neighbor on Salud Street. He went up San Ignacio Street and arrived at Tamarindo or Jagüita Street corner of San Ignacio and in passing he heard people talking, he looked around and "on the corner, to the right" he saw three persons. "One of the persons who were there was slim, fat (sic), short and dressed in a dark brown suit"; another "was dark complexion, taller and thinner", and he had on a striped shirt, and "the other was facing the two who were facing the other way and with their backs towards where he had to pass by; this one was white, tall and thin", dressed in a white suit. He thought he was Krenly Olivencia by the suit that he had on and by the right side of his chin. When he came out of the Club and went towards Jagüita Street he met Matildo Colón Rivera.

Octavio Torres, who worked in the cafe-restaurant "La Greca" and who said he knew the accused, testified that he saw them in the cafe between seven and eight o'clock on the

night of November 30, 1936. Krenly asked him for a half pint of rum and gave him ten cents and told him that he would pay the other five cents later. He returned at about 2:30 in the morning accompanied by Fernando and Felipe Olivencia. They sat down at a table and asked for food. Krenly paid with a five dollar bill that the witness took to the cash register to change, collect and give him his change.

Miguel Angel Díaz, owner of "La Greca", upon being called stated that he collected the money, made a package of it in a piece of paper and marked the package "Daily sales of Monday and Tuesday of 'La Greca' ''. The money was in his possession until Wednesday when he deposited it in the "Royal". Before doing this he took four five dollar bills from the package and gave them to a policeman.

Andrés A. Vélez again testified and said that on December 4, 1936 "when I was in the prosecuting attorney's office more or less at 12:15 the witness Torres was testifying and I was ordered by the prosecuting attorney to go to the cafe "La Greca" and get all the five dollar bills that there might be in the cash register and in the daily sales of Monday and Tuesday. Upon arriving at La Greca I asked him if he had deposited the money of that week . . . Then Miguel Angel Díaz gave me the key to the box and I opened it myself . . . A small box of tin, square and locked, and I took various packages which were in it and each package was marked and I took the package that had written upon it "Monday and Tuesday—Night". We then opened it and there were four five dollar bills . . . I took possession of them and gave Miguel Angel Díaz a receipt for them . . . . I came to the prosecuting attorney's office and before him I marked them 'A.V.I.P.' and I gave them to the prosecuting attorney."

Upon being asked "What is the serial number of the four bills?", he answered, referring to a note which he said he made upon giving them to the prosecuting attorney: "The first 'D25092567A', the second 'V61472923A', the third 'C39523676A', and the fourth 'C11481006A'."

When he was asked whether he noticed any thing when he took the bills, he answered: "Yes, sir, one of them had a small red spot in a corner."

The district attorney offered the bills in evidence and the court admitted them over the objection of the defense.

The prosecution then began to identify through the witness the clothing of the deceased, and once identified offered it in evidence. It was also admitted over defendant's objection.

The district attorney then called an expert witness, Rafael del Valle Sárraga, a bacteriological chemist who is the director of the laboratory of the Insular Department of Health. His testimony is long and detailed. Speaking of the handkerchief and of the bills seized and submitted for his examination, he spoke, in part, as follows:

"Well, the handkerchief was spotted. When the handkerchief was given to the expert the nature of that spot was unknown. The expert then had to make a chemical, physical and biological experiment to secure data to arrive at a conclusion. First I made a physical analysis with a spectroscope, and after isolating the spectral images, I arrived at the conclusion that that spot contained hemoglobine. I then made a chemical analysis and through the ordinary process I found serum-albumin, globulin and the small amount of sugar appearing in blood; I then made a microscopical examination of the spot on the handkerchief and found red and white corpuscles. With this information on hand the expert could ascertain that the spot was of blood, but he could not yet tell whether it was human or animal blood. I then used biological methods. The biological method is to treat a washing of the suspicious spot with certain specific serums. By means of those serums, the anti-human serum, I found characteristic and irrefutable reactions to the effect that the blood was human blood. The origin of a spot of human blood can not be confused with that of any other animal except those zoologically related to the human species as the monkey; . . . the blood on the handkerchief, without any doubt in the mind of the expert who investigated it, could be monkey's blood. . . That same test was made on the spot appearing on the five dollar bill marked 'C11481006A', and I arrived at the conclusion that the spot on the bill was of human blood.

"The last step of the investigation, that was the easiest, consisted in establishing the analogy between the spot appearing on the handkerchief and the one appearing on the bill. And as that is an experiment that perhaps the court might not understand if orally explained, he requested permission to explain it in writing on a board. Therefore, the following biological principle is by it established. (The expert illustrates it by a drawing on the board.) As all human being have in the corpuscles of their blood either type 'A' or type 'B' glutonins, either of those types, they are designated by two letters, but they must be pointed out in some manner in explaining the procedure. The serum of the blood of any human being, in the serum, in the corpuscles there is glutonin 'a', small letter, and 'b' small letter, 'A' capital letter, and 'B' capital letter. This is the other basis in this system of identifying the blood of one individual with that of another.

"Second ground: In the same person there can not exist at the same time glutonin 'A' capital letter, and glutonin 'a' small letter, because if glutonin 'a' small letter is mixed with glutonin 'A' capital letter, then that blood would form a compact mass, and the person would necessarily die. Taking this principle as basis, when through those reactions it is verified that a person has 'A' type glutonin, it is said that he belongs to group 'A', when he has 'B' type glutonin it is said that he belongs to group 'B', and when he has both, that he belongs to group 'A' and 'B'; and when he has neither of them that he belongs to group zero. It means, that in the human race, one can not find a single individual lacking one of those characteristical classifications. Now let us see how we may use that in criminal investigations . . . . but before doing so let us enunciate the third ground which is that said characteristic is unchangeable in individuals to such an extent that the one which is born in group 'A' remains in it through life and the climate nor the food, nor anything else can change him from group 'A' to group 'B', or from group 'A and B' to group 'C', and anywhere that a person goes leaves behind him a trace of his characteristics. The individual belonging to group 'A', who has type 'A' characteristics, if he leaves a trace of blood on a piece of cloth or on a solid body, and one desires to know afterwards if that blood belongs to the group to which that person belongs, one may do so through those biological reactions. . . In this case that I investigated and that I am now explaining, the blood on the handkerchief belonged to group 'A', as well as the blood on the bill."

When the doctor was asked, "Doctor, at what conclusion did you arrive at after determining that the blood on the handkerchief belonged to group 'A' as well as the blood on the bill?", he answered, "That it was of the same kind.— That it was the same blood?—Yes, sir."

Tomás E. Molina then took the stand and testified that he knew defendant Fernando Olivencia and had loaned him a few months ago a wine colored sweater. He identified the one showed him by the district attorney as the sweater that he had loaned him; and Ovidio Ramos also identified it as the sweater that, on the night of November 30, 1936, at about nine o'clock, he delivered to the defendant in the shop of a brother of the witness, where the defendant had left it. The sweater was offered in evidence and admitted over the objection of the defense.

Sunta Collazo, the concubine of Vientós, testified that the last time she saw him was on the night of November 30, at about a quarter past or half past eight. He was dressed in gray and had $1,200 in the right hand pocket of his trousers, and he left his house on Salud St., where he lived with the declarant, and did not return. He left for the Casino, located over the Hardware Store, in front of Colón Square.

Ricardo Nadal Cabassa saw Vientós on the night of November 30, in the Mayagüez Casino, at about half past eleven. The witness left for "La Greca", and there saw him again at about one or half past one; Vientós left and the witness remained there. He also saw the defendants that very night in "La Greca", at about two in the morning, they were with Felipe, a cousin of Krenly. The latter "approached the table where I was sitting; I believe that Nano and Felipe left for another room of 'La Greca'. We had a bottle of rum on the table from which we were drinking. Krenly took a drink, he is a friend of mine and we were familiar with each other . . . I think that he was dressed in white or in gray, or something like that."

Emilio Nochera saw defendant Krenly Olivencia on the night in question. He was in the rear of the Mayagüez Casino, at about one or half past one. He was looking "up and down the street."

Maximino Colón Rivera was called to the stand. He was one of the persons present at the wake in the Ward Juan Alonso. Upon returning to the city he saw two young men standing on the corner of San Ignacio and Jagüita streets, one was dressed in white and the other was wearing a red shirt and gray trousers. He kept on walking and came across Vientós. It was after one o'clock.

Carlos Nazario was the next witness to testify. On the night in question at about half past twelve or quarter to one, he saw Krenly Olivencia in front of "La Greca", and Fernando "in the square, when he left the Casino." The former was dressed in white, the latter had on gray pants and a wine colored shirt. Krenly "asked me for a cigarette and then I asked him: 'What are you doing here?' and he answered 'nothing much', and at that very moment I entered 'La Greca' and there found the deceased and said hello to him . . ." Vientós left in fifteen or twenty minutes.

He saw the defendants again that night in "La Greca" at about half past two more or less. They went in. He tells of the incident of Krenly in Nadal's table, and then stated: "They asked for a bottle of 'Puerto Rico' rum and they offered me some, but I declined. Then they asked for mince pies (*pasteles*). While they were eating they spoke about something I can't remember, then he got up and paid the bill . . . with a five dollar bill."

Jorge Vélez testified that on the night of the crime he left the Club Mayagüezano at about quarter to one and walked along the corner of San Ignacio and Jagüita streets. That there he saw Krenly Olivencia dressed in white and another person that he did not recognize who was dressed in gray with a wine colored sweater. The latter had a stick on his hand. The street was deserted. There was no moon.

The last witness called by the prosecution was José Irizarry. He made reference to an argument had before him by Krenly Olivencia and Vientós, at the end of which the former said "that he felt like knocking his block off."

Such was, in short, the evidence introduced by the People in this case. If correctly admitted, since it was believed by the jury, it is, in our opinion, suffcient. No single witness charges the defendants directly with the commission of the crime, but the links are so well and firmly joined that they are enclosed in a circle compatible only with guilt.

The evidence of the defense tended to show that the defendants were not in the scene of the crime on the date and hour on which the death of Vientós occurred, and that the bill that defendant Krenly Olivencia gave to the clerk of "La Greca" on the morning of December 1, was legally acquired by him (Krenly); and that it was impossible to determine that it had been the same one that was examined by Dr. del Valle Sárraga; but that evidence was not believed by the jury.

Passing upon the conflict in the evidence, and deciding it in favor of the prosecution, the jury acted within the scope of its duty, and there is no ground whatever to hold that it abused it.

██ Let us examine now the eleven errors assigned by the appelants as having been committed by the lower court in admitting the evidence.

Carlos Ayala was testifying, he was the sixth witness presented by the district attorney. Upon being asked by him whom did the third person he saw in the corner of San Ignacio and Jagüita streets resemble, he answered, "Well, he look slightly like . . ." The defense moved that the testimony be stricken from the record. The court refused and the witness finally answered, "Well, the last one I described looked like Krenly Olivencia." And explaining why he said that on account of the suit he was wearing and the way the right hand side of his chin looked.

Aside from the fact that had the error been committed it could not have been considered prejudicial, since previously Matildo Colón Rivera had testified that he recognized Krenly Olivencia, the truth is that we think that it was not committed.

It will suffice, to support our conclusion, to transcribe the citation from Underhill that appears in the brief of the prosecuting attorney. It reads as follows:

"The identity of the accused with the person who committed the crime is an important element. Its proof is always essential and in some cases difficult. The relevancy of evidence of identification depends upon the circumstances of the case. Generally speaking, any fact which would convince or tend to convince a person of ordinary judgment in carrying on his everyday affairs, as to the identity of a person will be received. The evidence will be permitted to take a wide range. Usually evidence of identity comes from those present when the crime was committed and who state that they saw the accused commit it. This is direct evidence of identification, but circumstantial evidence may be received. In an extreme case of this sort, the crime having been committed on a Thursday, the state was permitted to prove that the accused had a superstitious belief that Thursday was a lucky day for him, and that he would be successful in anything he attempted on that day. So it may be proved that the accused had been previously indicted under the assumed name alleged in the indictment. A witness may testify that he identified the accused after his arrest as the person he saw commit the crime. And a witness may testify that a photograph of the accused taken at the time of his arrest and exhibited to the witness on the stand resembled the person he saw commit the crime. A witness testifying to identity may describe a person whom he saw in the vicinity of the crime at the date of its occurrence and he may testify to the actual color, height, weight and other appearances of this person and his description may be compared with that of the accused by the jury. . . .

. . . . . . . . . . .

"It is proper in order that the jury may determine the extent of the knowledge of a witness testifying to the identity of the accused to permit him to be asked how long he has known the accused and how long and how often he had visited him. And where the evidence of identity is circumstantial, it may be permitted to take a wide

range. Any facts, which on their face, appear to relate to the accused and which are of a descriptive character which correspond in their details with a description of the accused, show by other evidence, are admitted. Thus, a description of the accused, giving his name, age, nationality, place of birth and port of arrival contained in a report made by an officer of a vessel to the officers having charge of immigration matters was received, where, from the evidence, it appears that the accused had been an immigrant, and the descriptive statement tallied in its details with other facts brought out in the evidence. The presence of defendant's automobile near the scene of the crime at time of its commission, or his finger prints at place of crime, are admissible.

. . . . . . . . . .

"Whether a witness in identifying the accused as a person who committed the crime is expressing an opinion or stating a fact within his own knowledge is a question upon which a diversity of opinion exists. Some of the authorities regard identity as a fact and require the witness to identify the prisoner solely as a matter of his own knowledge and on personal recollection. So the witness may be asked, 'Do you know A?' and, if he does, he may then state whether the accused is the individual mentioned. He can not be permitted to state that he 'thinks' the accused is A, or give his impression that a man whom he saw near the scene of the crime is identical with the accused. He should state facts, leaving the inference of identity with the jury.

"According to another view, a witness in identifying the accused is expressing an opinion or impression, founded on his observation of numerous details, as his physical appearance, dress or other personal and peculiar incidents. He is accordingly permitted to frame his answer to a question touching the identity of the prisoner, in the form of an expression of opinion or believe or state it as his impression mainly because the facts constituting similarity, or the reverse, in personal appearance are so numerous and pecular that they can not be specifically narrated so as to bring out clearly their proper force and significance before the jury. Hence a witness, after describing a person seen by him, may state that, in his opinion, it was the prisoner or that he resembled the prisoner, under the rule permitting a nonexpert witness to give his opinion where the jury would be unable, otherwise, to form an intelligent conception of identity.

"The testimony of a witness that he believed he recognized the accused as the one he saw taking away stolen property, and that he saw and recognized other men who were with him, has been admitted. Indeed, even if it be conceded that identity is a fact, the answer should hardly be rejected because the witness is not positive of the identity of the accused beyond all doubt; or, because, through excessive caution, he qualifies his answers by such expression as 'I think,' or 'I believe.' Witnesses can not be required to state all facts with equal positiveness. . . . Uncertainty of identifying evidence goes to its weight, rather than to its admissibility.

"Testimony as to identity by one witness is sufficient, if believed, as the defendant need not be identified positively by any number of witnesses, but identification must be reasonably clear and convincing." Underhill on Criminal Evidence, 4th Ed., page 172, paragraph 127.

The question raised by the assignment of error goes to the weight rather than to the admissibility of the evidence. It is clear that testimony that merely shows the similarity of a given person to another person will not be, of itself, sufficient to conclude that the given person was the other one, but it does not mean that the testimony is inadmissible since other evidence introduced might give the former sufficient weight to support the finding. We repeat, that in this case another witness had testified without hesitancy that the person resembling defendant Krenly Olivencia was, in fact, the defendant.

■ The second, third, fourth and fifth assignments of error concern the admission in evidence of the four five dollar bills seized by policeman Vélez in "La Greca." It is specifically charged in the second that error was committed in allowing Vélez to identify the bills without having connected the defendants with them; the third in permitting the bills to be shown to Vélez without the existence of said connection; the fourth, in admitting the bills in evidence in the absence of said connection, and the fifth in permitting the questioning of expert Dr. del Valle Sárraga as to the results of the tests performed by him on the bills that had not been connected with the defendants.

In our opinion, said errors were not committed. The crime charged is murder, voluntarily committed, with malice aforethought and with the firm and deliberate intention of killing while committing the robbery. The element allegedly lacking does exist. Let us see.

From the testimony of Sunta Collazo, Vientós' concubine, we know that the latter left the house with twelve hundred dollars; from Vélez's testimony we find that some one hundred and sixty four dollars were found on his body in one of the front pockets remaining below the body when he fell dead on the street, and that his rear pockets were turned inside out. We further know that the defendants went early to "La Greca" and when Krenly paid the bill for the rum consumed, he only gave ten cents on account and left five cents still owing, and that after the death of Vientós they returned to said establishment and Krenly, to pay his bill, tendered a five dollar bill. The evidence also shows that that bill, together with the other cash receipts of the day, were separately kept, and it was therefrom that the police took the four five dollar bills in question, one of which was stained, and that when the expert examined that spot, not only did it turn out to be human blood, but blood of the same type that spotted Vientós' handkerchief when he was wounded. The chain is complete.

The sixth and seventh errors are both related to the admission in evidence of the sweater. The sixth on the ground that when the sweater was admitted in evidence no witness had testified that it had been worn by one of the defendants on the night of the crime, and the seventh, that the evidence draws no connection between defendant Frnando Olivencia, who was prejudiced by its admission, and the crime prosecuted.

It is true that the wine colored sweater was admitted in evidence before witness Jorge Vélez clearly testified that the other young man who was standing with Krenly Olivencia in

the corner of San Ignacio and Jagüita streets, was wearing a wine colored sweater, but the truth is that several witnesses had described one of the young men standing in said corner as wearing a wine colored shirt.

No error, therefore, was committed by the court in admitting said evidence on the ground set forth in the sixth assignment, nor on the ground set forth on the seventh, since although one must acknowledge that the evidence is much stronger against defendant Krenly Olivencia, it is not insufficient as to Fernando, of the same surname, who had received the sweater in question as a loan from its owner Tomás E. Molina, who had left it at the store of the brother of Ovidio Ramos, and went to get it on the night of November 30, 1936, at about nine o'clock.

█ It is maintained by the eighth assignment of error that the court erred in permitting witness Sunta Collazo to testify that Vientós had twelve hundred dollars, because that amounted to fatal variance between the allegations and the proof.

After arguing the assignment, the defendants state in their brief, in part, the following:

"The defense based its objection on the fact that the information substantially charges the defendants in this case with the killing *while attempting a robbery* (see the record, page 1), thus, the specific charge against the defendants being killing a person *while attempting a robbery* and not *while committing the crime of robbery*. To allow presently, through the testimony of this witness for the prosecution, Sunta Collazo, proof that the deceased had money on his person and that the same had been taken from him, which would make the defendants guilty of robbery rather than of *attempting a robbery*, constitutes a fatal and substantial variance between the specific allegations of the information and the evidence introduced, since the crime of attempting a robbery is entirely different from that of robbery."

We are familiar with the information. It charges the defendants with murder for illegally and voluntarily killing Vientós, with malice aforethought, and with the firm and de-

liberate intention of killing him, thus showing a malignant and perverted heart. It further states "while attempting a robbery," but if those words were stricken out, the charge would still be sufficient and the district attorney could have, in spite of it, offered evidence tending to show that the crime was committed while robbing.

This being so, and if such words, as argued by the prosecuting attorney, were used to determine the motive for the crime that although not constituting an essential element that must be necessarily alleged and proved, may be so alleged and proved, why not admit as evidence of the intention the commission of the crime attempted?

Furthermore, we think that the cases of *People* v. *Izquierdo*, 25 P.R.R. 353, and *People* v. *Matos*, 26 P.R.R. 520, decide the question contrary to appellants' contention.

In the first of these cases, the information charged Rufino Izquierdo with the death of the boy Ramón Mercado, voluntarily committed, with malice aforethought and with a firm and deliberate intention, thus showing a perverted and malignant heart. The evidence tended to show that the murder was perpetrated while breaking and entering. The appellant therein argued that a fatal variance existed, and this Court decided the question in the negative. In the opinion cases of several states are cited. We shall only transcribe that of Texas. It was the case of *Wilkins* v. *State*, 34 S. W. Rep. 627, and reads as follows:

"The charge of the court is objected to because it instructs the jury that 'all murder committed with express malice is murder in the first degree'; and 'the law declares that all murder committed in the perpetration or attempted perpetration of robbery is murder in the first degree.' The last sentence is objected to because the indictment in this case only charges this defendant with murder with malice aforethought, and nowhere charges this defendant with murder in committing or attempting to commit the offense of robbery. The contention of the appellant in both particulars has been decided against him. See *Sharpe* v. *State*, 17 Tex. App. 486; *Giles* v. *State*,

23 Tex. App. 281, 4 S. W. 886. There was no error in defining robbery, because it is settled that under the indictment charging murder with malice aforethought the accused can be convicted of murder in the first degree if it were in the perpetration or attempted perpetration of robbery. It was the duty of the court to define robbery." 34 S. W. Rep. 628.

And in the case of Matos, supra, transcribing from the syllabus, it was held:

"When the information charges that the death was caused by the defendants in an unlawful and wilful manner, with malice aforethought and with fixed and deliberate intent, by waylaying and attacking the deceased treacherously, it charges murder in the first degree although it does not allege that the death was caused while committing a robbery, and it may be proved at the trial that the defendants killed the victim while they were committing a robbery."

■ The ninth assignment of error is worded as follows:

"The court erred in holding that no fundamental conflict existed between the testimony given by witness Sunta Collazo before the district attorney and what she testified on the witness stand, not only because the conflict existed, but also because the determination of that question corresponds to the gentlemen of the jury and not to the judge presiding the Court."

While witness Sunta Collazo, a witness for the prosecution, was testifying, an incident occurred over an alleged conflict detected by the defense between the testimony given by her in court and the one given by her before the district attorny in the preliminary investigation of the case. After the question was fully argued, the court said in deciding it: "After the point has been cleared, the jury will weigh the evidence. The court thinks that no fundamental conflict exists."

And the appellants allege that by thus acting the court "trespassed beyond the bounds of its authority, depriving the jury of one of their rights" thus substantially prejudicing "the rights of these defendants."

We have examined the record and we think that the mere fact that the witness testified before the district attorney that

she had told Vientós "Don't go out because you are going to lose the money, and he answered me, 'I'm returning shortly, at about eleven,' and he did not come back", and at the trial that "I told him that I still wanted him to buy me my house, that that money was for the house, and he told me then that he would buy me the house and that I should not worry because he had the money", does not constitute a real conflict. Both statements bring forth the same fears, to wit, that the money could be lost, the latter being more specific.

Naturally that if Vientós was going to the Casino where people gambled and if he gambled, as the evidence tends to show, the woman with whom he lived and that of course hoped to obtain from him a home of her own, secure, should worry about the loss of the money.

It would have been better had the judge expressed no opinion, merely stating what he so correctly said at first, to wit: "After the point has been cleared, the jury will weigh the evidence," but his other statements—which in fact only stated the truth—could not have prejudiced the defendants, nor does the slightest indicia exist to show that they did.

By the tenth assignment it is charged that the court erred in allowing witness Irizarri to testify concerning the enmity that existed between one of the defendants and Vientós, because that was contrary to the theory of the information.

The error is nonexistent. The new element introduced by the testimony admitted in evidence was not in conflict with the charge of murder committed with malice aforethought and with a firm and deliberate intention, thus showing a perverted and malignant heart, nor with the intent to rob. One could easily add to those other perverted intentions the one of vengeance, by reason of previous quarrels.

The truth is that the declaration in question, closely examined, has but little import, and that the prosecution could have eliminated it without prejudicing its case, but as it was offered, and was admissible, the court acted correctly in ad-

mitting it. See *Wharton on Criminal Evidence*, 11th ed.. volume 1, par. 255, page 307.

 There only remains for our consideration the eleventh error assigned. It is stated as follows:

"The court erred in refusing to order stricken from the record that part of the testimony of Sunta Collazo that refers to the money she said was in possession of deceased on the night in question, because after the prosecution rested it had not been proved that the defendants or either one of them knew that the deceased was carrying any money on his person that night."

If the crime of murder, of which the defendants were accused by the People, had been specifically charged as having been committed while intending or while committing a robbery, the question raised would be of importance, but it is not if we start from the point that the murder here in issue fundamentally consists of the violent killing of a human being with malice aforethought and a firm and deliberate intention, thus showing a perverted heart.

We should not stray from the fact that even turning away from the idea of robbery, the testimony brought forth an element that tended to clear up the crime by connecting the defendants with the site of the robbery, as stated by the district attorney in his brief.

Furthermore, the jury's verdict was not of murder in the first degree. It was, after receiving from the court the due instructions, of murder in the second degree, which seems to imply that the judges of fact discarded the evidence as to robbery.

"After verdict", as decided by *Crapo v. United States*, 100 F (2d) 996, 1000, "every intendment must be indulged in support of the indictment. The verdict cures mere formal or technical defects, unless it is apparent that they have resulted in prejudice to the defendant."

For the above reasons, the judgment appealed from should be affirmed. We are dealing with a terrible crime. We owe the discovery of the culprits to the effective and intelligent work performed by the Department of Justice and the Police

force. The evidence introduced is wholly circumstantial, but it is clear, strong and convincing. The verdict of the jury moving for leniency shows that in spite of the influence that the youth of the defendants exercised upon them, and their apt defense, the judges impanelled obeyed the voice of their conscience, their feelings having been manifested solely in the manner stated. The penalty imposed by the judge is weighty, but it is authorized by law and justified by the manner in which the crime was committed. It all leads to the belief that justice was done. On that account, the appeal must be dismissed and both the order and the judgment appealed from affirmed.